(No. 35385.▮▮▮▮▮▮▮▮▮▮▮▮)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* STEPHEN KALEC, Plaintiff in Error.

*Opinion filed September 22, 1961.*

**506**

JULIUS LUCIUS ECHELES and BARRY GOODMAN, both of Chicago, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and JOHN T. GALLAGHER, and MARVIN E. ASPEN, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE SOLFISBURG delivered the opinion of the court:

The defendant, Stephen Kalec, was indicted on a charge of murder of one Joseph Bryniczka. He was tried before a jury, found guilty and after motions for a new trial and in arrest of judgment were denied, his punishment was fixed at imprisonment in the penitentiary for life. The case comes to us on writ of error.

The defendant contends that there was insufficient evidence to support the verdict, and that he was denied a fair trial by the interference of the trial judge. His additional contention that he was not tried within four months of confinement was waived upon oral argument.

It appears that defendant worked as a bartender in a Chicago tavern located at 1858 West 47th Street, owned by Joseph Pietrzyk. On May 2, 1958, he returned to the tavern in the evening after working all day. He had several drinks with Pietrzyk, one Nendza, the deceased Bryniczka and three girls. It appears that everyone there was drinking a substantial amount. Defendant left the side door of the tavern between 9:45 and 10:00 P.M. It is undisputed that the deceased and Nendza also left about the same time, but the testimony is in conflict as to the exact order of their leaving. The witnesses in the tavern then heard three or more shots, and the defendant was seen walking away from the body of the deceased. They heard no argument between the defendant and the deceased, and did not see defendant with a gun.

The witness Nendza testified that he knew both the defendant and the deceased for many years; that he left the tavern about 10:00 P.M. with the defendant at his request. When they reached an alley next to the tavern, defendant turned, drew a gun and fired three shots wounding Nendza. Nendza got up and while walking out of the alley heard three more shots.

Angela Stefaniak lived next to the tavern, and was at home on the second floor the night of May 2, 1958, when she heard three shots. She went to the kitchen window and saw the defendant and deceased walking from the tavern. She heard defendant say to deceased, "You—— —— ——, we'll settle this in the alley." Before they reached the alley, the defendant turned and fired three shots at deceased who fell back upon the ground, and defendant walked back to the tavern.

The police found defendant asleep in a booth in the tavern when they arrived. They did not find the gun used to kill the deceased.

We think the record clearly supports the verdict of the jury. The testimony of the eyewitness, Stefaniak, is credible and corroborated by other witnesses. We do not give substantial significance to the discrepancy in the testimony of witnesses in the tavern regarding the exact number of shots heard and the exact sequence in which Nendza, the deceased and the defendant left the tavern. Considering the atmosphere in the tavern, the conflict in the testimony is understandable.

Defendant also asks us to reverse the judgment and remand the cause because of alleged misconduct of the trial judge. He cites four instances which he claims constitute reversible error. The first arose when the trial judge refused to permit certain questions to be put to an investigating officer on cross-examination, although the State had made no objection. We have examined the record carefully and it is patent that these questions involving certain facilities of the Crime Laboratory's Mobile Unit were both immaterial and beyond the scope of the direct examination.

Again, without objection on the part of the State, the court refused to permit defendant's counsel to examine a witness with regard to an argument between defendant and deceased five months before, on the ground the incident was too remote. From an examination of the record, we think that the questions asked were objectionable. Considering the entire record, we think the trial judge did not commit prejudicial error in limiting the scope of the testimony to the relevant issues in the case in these two instances.

Defendant further complains of the trial court's statements upon cross-examination of the State's witness Angela Stefaniak. The first colloquy, which took place when the witness was being cross-examined concerning a photograph of her apartment, was as follows:

"Q. And, when you first heard, that is, you heard the first three shots, you looked out the window of your mother's apartment, isn't that correct?

A. That is right.

Q. Well, that is the second floor, isn't it?

A. Yes, sir.

Q. Well, that particular window isn't shown.

The Court: That isn't her fault.

The Witness: A. That is the first three shots I heard.

The Court: She said it would have been shown if that post wasn't in the way.

Mr. Egan: This picture, to me, doesn't show the second floor.

The Court: I don't know anything about it.

Mr. Egan: That's the picture.

The Court: This is only part of the building; obviously, the building goes up.

Mr. Egan: Yes, judge.

The Court: She says the window is up here (indicating) It doesn't show because the post is in the way.

The Witness: The post is in the way.

The Court: It is obvious in the picture itself that this is what the situation is. That only shows the first floor of the building.

Mr. Egan: That is the point I wanted to make.

The Court: There is no point to it. That only shows the first part of the building and that is all. That's pretty obvious.

Mr. Egan: That is what I wanted to clarify.

The Court: She pointed out to you that the window she is talking about is up on the second floor behind this post.

Mr. Egan: No, she didn't say it.

The Witness: I did, too.

Mr. Egan: I don't want to haggle about it. She pointed it out to me.

The Court: I saw what she pointed out. She said the upper window would be behind that post.

Mr. Egan: I must have been mistaken, your Honor."

Another complaint concerns remarks which occurred during an attempted impeachment of the same witness, and is reported as follows:

"Q. You remember being questioned by a deputy coroner (at the coroner's inquest), don't you, or somebody there?

A. Yes, sir.

Q. Was this question asked of you and did you—

'Q. How many shots did you hear fired?

A. I could not tell you the amount fired. It was three originally.

Q. To the best of your knowledge?

A. I could not never say anything like that'

Q. Were those questions asked of you at the coroner's inquest and did you make those answers?

A. Shall I give you my answer?

Q. Yes, please.

A. At the coroner's inquest, I was asked how many shots were fired.

Q. The point is yes or no.

The Court: The objection is sustained. It's not impeaching in any way.

Mr. Egan: You mean at the coroner's inquest, Judge?

The Court: That's what you just read. I didn't see the coroner's inquest.

Mr. Egan: It says, "I cannot tell you the shots fired. It was three originally," meaning the three she first heard. Then, "to the best of your knowledge. I cannot never say anything like that."

The Witness: Those were not even put up to me.

The Court: Let's see the transcript. I thought I heard or understood you to say that.

Mr. Egan: She looked out and saw nobody and then she heard three more shots.

The Witness: A. I saw two men walk out.

Mr. Egan: I submit that that's not what she talked about at the coroner's inquest.

Mr. Stamos: I object to counsel arguing.

Mr. Egan: She said she—

The Court: It says, "How many shots did you hear fired? I could not tell the amount fired. *I was* three originally." It's a misprint by the court reporter.

The Witness: I told the coroner directly it was three shots, sir. There were men there listening.

The Court: That's an incorrect transcription.

Mr. Egan: Judge, I must object to that remark.

The Court: It's only fair to say it, because the record says, *"I was* three shots fired."

Mr. Egan: I don't know.

The Court: I do. She didn't say, "I was." I'm quite sure its a mistranscription.

Mr. Egan: How about the part, "I could not tell you the amount fired."

Q. Did you say that?

A. No, sir, I didn't say that.

Q. You didn't say that at the coroner's inquest?

A. I said three shots, I said there were three shots fired.

The Court: Q. No. The Question is: Did you say you didn't know how many shots were fired?

A. No, sir, I never said that.

Mr. Egan: Q. Did you say, "I could not tell you the amount fired"?

A. No, sir."

Neither the photograph nor the transcript of the coroner's inquest are before us on this appeal.

In the absence of the actual photograph, the examination with regard to it is ambiguous. The transcript of the testi-

mony, taken in its proper context, appears to us to be little more than an attempt by the trial court to eliminate a semantic misunderstanding between witness and counsel. We also note that defense counsel clearly established the point he desired to make; that the picture did not show the second floor of the apartment.

Turning next to the questioning relating to the coroner's inquest, we think the defense was permitted sufficient latitude in cross-examination. It is significant that when the witness denied much of her purported testimony at the inquest, the defense made no effort to impeach by proving the alleged prior testimony. The only comments of the trial judge objected to were his references to a misprint or incorrect transcription of the court reporter. The context makes it clear that the only misprint referred to was the statement "*I was* three shots fired." We cannot see how this could prejudice the defense.

We have condemned the interjection of the trial judge into a case by extended interrogation of witnesses or by impertinent remarks or comments reflecting on the veracity of witnesses or the integrity of counsel, and will not hesitate to reverse when such action is prejudicial to the defendant. (*People* v. *Coli,* 2 Ill.2d 186; *People* v. *Pelletri,* 323 Ill. 176; *People* v. *Judycki,* 302 Ill. 143.) The trial judge, however, may properly act to confine the evidence to the matters at issue and aid in clarifying obvious confusion between a witness and counsel. Such a function of the trial judge must, however, be exercised with restraint so that there is no suggestion that the judge is occupying the role of a prosecutor.

We have carefully examined the entire record in the light of the foregoing principles, and we find that the conduct of the trial court was not prejudicial to the defendant.

It is our conclusion that the defendant was fairly tried and that the verdict was amply supported by the evidence. The judgment of the criminal court of Cook County is accordingly affirmed.

*Judgment affirmed.*